No.   90-317

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

STATE OF MONTANA,

       Plaintiff and Respondent,

v.

PAUL DEMETRI KORDONOWY,

       Defendant and Appellant.

FILED

DEC 23 1991

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Seventh Judicial District,
In and for the County of Richland,
The Honorable Kenneth Wilson, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

         Peter O. Maltese, Attorney at Law, Sidney, Montana

      For Respondent:

         Hon.  Marc  Racicot,  Attorney  General,  Helena,
Montana; Joseph E. Thaggard, Assistant Attorney
General, Helena, Montana
Mike  Weber,  Richland  County  Attorney,  Sidney,
Montana


Submitted  on  Briefs:  October  31,  1991

Decided:  December 23, 1991

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Paul Demetri Kordonowy (Kordonowy) appeals his convictions of aggravated burglary and sexual intercourse without consent following a jury trial in the Seventh Judicial District, Richland County. We affirm.

Kordonowy presents the following issues:

1. Did the District Court abuse its discretion by admitting certain other crimes, wrongs, or acts evidence?

2. Did sufficient evidence support the jury's verdict?

In July 1987, K.B. lived in Sidney, Montana, and was employed as a counselor for District II Alcohol and Drug Program. On Friday, July 24, 1987, following a full day's work, she ran a few errands and returned home at around 7:00 p.m. She spent a quiet evening at home alone. Before retiring that evening, she locked the front door of her house but left the back door unlocked. She later retired to her bed to read, removed her hearing aids and her glasses, apparently turned off the light in her bedroom, and fell asleep. Without her hearing aids, K.B. could not hear unless the source of sound was next to her ear; without her glasses, her vision was poor.

In the early morning hours of July 25, 1987, K.B. awoke. Although her bedroom was dark, light shining through her bedroom window allowed her to view a man lying next to her on her bed. At first, she thought the man was her boyfriend, L.L., and called out

his name. She quickly realized, however, that the man was not L.L. She viewed the man for less than a minute before he forcibly grabbed her by the shoulders, flipped her over to her stomach, and placed a pillowcase over her head. He then pushed her face into the pillows on her bed, which constricted her breathing and caused her nose to bleed.

The man attempted sexual intercourse, but was unable to penetrate K.B.'s vagina with his penis. He then flipped K.B. to her back, placed the pillows on top of her head, pushed the pillows into her face, and again attempted sexual intercourse. This time, he penetrated K.B.'s vagina with his penis, but failed to complete the act.

K.B. asked the man if she could go to the bathroom. The man led her to the bathroom with the pillowcase still over her head. While they were in the bathroom, K.B. suggested that they find some lubricant in an attempt to get the man to leave his fingerprints on some objects. The man, however, forced K.B. to grab something and then led her back into her bedroom.

Following their return to her bedroom, the man pushed K.B. onto the bed and attempted to have anal intercourse with her by sticking his finger up her rectum. K.B. asked the man to stop and the man complied. The man then put his head next to her ear, asked her if she climaxed, and told her that he loved her. He then left her bedroom.

K.B. waited a few minutes before getting up from the bed and removing the pillowcase from her head. She walked through her home and determined that the man had left. She then telephoned a friend and told her she had been raped. She additionally telephoned the police for assistance. The police escorted K.B. to a hospital for a sexual assault examination.

K.B. was able to give authorities a description of the man from viewing him prior to the time he placed the pillowcase over her head and through her sense of touch. She told police that the man was white; in his twenties or thirties; weighed between 145 to 160 pounds and was of average height; had dirty, dark hair; a triangular-shaped face; and a muscular build, except for some flab around his waist. She further told police that the man wore heavy denim pants, work boots with a rounded toe, a tee shirt, and a wide belt with a heavy buckle. Because of her hearing and sight impairment, however, K.B. could not go beyond this description and positively identify her attacker.

In January 1989, the Richland County Sheriff's Department apprehended Kordonowy regarding a similar rape which occurred in the nearby town of Fairview, Montana. The victim, V.N.O., identified Kordonowy as the man who raped her under the following facts. On the evening of Friday, January 20, 1989, V.N.O. spent a quiet evening at home alone. Prior to retiring to bed, she locked the front door of her home, but apparently forgot to lock the side

door. At approximately 2:00 a.m. on Saturday, January 21, 1989, V.N.O. awoke and viewed Kordonowy sitting on her bed. Kordonowy wore round-toed boots and a belt with a heavy buckle. V.N.O asked Kordonowy what he was doing in her bedroom. Kordonowy responded by grabbing V.N.O. and pinning her arms above her head as she laid on her back. Kordonowy twice raped V.N.O., once as she laid on her back and once as she laid on her stomach. At V.N.O's request, Kordonowy allowed her to go to the bathroom. He later attempted anal intercourse with V.N.O. but ceased this act when V.N.O. asked him to stop. Before departing her house, Kordonowy placed a pillow over her head. Kordonowy later pled guilty to, inter alia, sexual intercourse without consent against V.N.O.

Because of the similarity of these rape cases, authorities suspected that Kordonowy may have also raped K.B. Accordingly, authorities submitted the blood, hair samples, and pubic combing taken from K.B. as well as the sheets, pillowcases, underpants, and vacuumings seized from her house to the State Crime Lab for comparisons with samples of Kordonowy's head hair, pubic hair, and blood, which he had provided the Richland County Sheriff's Department regarding the V.N.O. matter.

Forensic scientist Arnold Melnikoff (Melnikoff) of the State Crime Lab testified that with caucasian head and pubic hair, he could microscopically distinguish an individual's respective head and pubic hair from another individual's respective head and pubic

5

hair in ninety-nine out of 100 cases. He compared the known standards of head and pubic hair obtained from K.B. and Kordonowy. Melnikoff testified that he could distinguish the known standards of K.B's head and pubic hair from Kordonowy's head and pubic hair. He further compared the known standards of Kordonowy's head hair to a head hair of an unknown origin which was found in K.B.'s bedroom. He testified that he could not microscopically distinguish Kordonowy's head hair from the head hair of unknown origin. Additionally, Melnikoff compared strands of Kordonowy's pubic hair to pubic hair of unknown origin found in the combings of K.B.'s pubic area following the rape and pubic hair of unknown origin found in the vacuumings of K.B.'s bathroom. Melnikoff testified that he could not microscopically distinguish Kordonowy's pubic hair from these pubic hairs of unknown origin.

Julie Long (Long), a serologist at the State Crime Lab, examined Kordonowy's blood type, K.B.'s blood type, and K.B.'s boyfriend, L.L.'s, blood type. She also examined semen found on vaginal swabs taken from K.B. during the course of the sexual abuse examination and semen found on two pairs of K.B.'s underwear seized from her bed and her kitchen. Following her examinations, she concluded that Kordonowy could not be excluded as the donor of an enzyme known as the "H" substance found in semen retrieved from one of the vaginal swabs and on both pairs of underwear. In addition, Long testified that she found the "A" enzyme present in the semen

6

found on the vaginal swabs and on both pairs of K.B.'s underwear, and that neither K.B. nor Kordonowy could have secreted that enzyme. She further testified, however, that the "A" enzyme could have been provided by either bacteria or L.L., who engaged in sexual intercourse with K.B. within seventy-two hours prior to the rape.

Based on these conclusions of Melnikoff and Long, the State charged Kordonowy by information with one count of aggravated burglary and one count of sexual intercourse without consent against K.B. A jury convicted Kordonowy of both charges on January 18, 1990. On February 16, 1990, the District Court sentenced Kordonowy to thirty years imprisonment for the aggravated burglary charge and twenty years imprisonment for the sexual intercourse without consent charge, these sentences to run concurrently. The District Court further sentenced Kordonowy to a concurrent term of twenty years imprisonment for his status as a persistent felony offender, and designated him as a dangerous offender for purposes of parole eligibility. The District Court ordered all of these sentences to run consecutively to the sentences imposed in State v. Kordonowy, Richland County Cause No. 89-003 (Seventh Judicial Dist. Ct. 1989). From these convictions, Kordonowy appeals.

1. Did the District Court abuse its discretion by admitting certain other crimes, wrongs, or acts evidence?

7

Kordonowy argues that the District Court erred when it allowed into evidence V.N.O.'s testimony, which chronicled the evening when Kordonowy raped her. Kordonowy argues that this other crimes, wrongs, or acts evidence violates Montana Rule of Evidence 404(b) and related Montana case law.

Montana Rule of Evidence 404(b) provides:

> Other crimes, wrongs, acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. [Emphasis added.]

Montana Rule of Evidence 403 additionally provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Montana Rules of Evidence 404(b) and 403 preclude the admission of evidence of other crimes, wrongs, or acts if this evidence is offered to prove a defendant's character and that he acted in conformity therewith, or if the prejudicial nature of the evidence substantially outweighs its probative value. The last sentence of Montana Rule of Evidence 404(b), however, allows other crimes, wrongs, or acts evidence if it is admitted to prove the identity of the defendant.

This identity exception is often used "[t]o prove other like crimes by the accused so nearly identical in method as to earmark

8

them as the handiwork of the accused." McCormick, _Evidence_ 449 (1972), _noted in_ Wright & Graham, Federal Practice and Procedure: Evidence § 5246. Here, we hold that the facts of the two rape incidents are so nearly identical in method that they can be earmarked as the handiwork of Kordonowy; accordingly, the testimony of V.N.O. fits into the exception of proving identity under Montana Rule of Evidence 404(b). We further hold that V.N.O.'s testimony did not violate Montana Rule of Evidence 403 because its probative value was not outweighed by its prejudicial value.

2. Did sufficient evidence support the jury's verdict?

The standard for reviewing issues concerning sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, _any_ rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; _restated in_ State v. Kao (1990) 245 Mont. 263, 267, 800 P.2d 714, 716. We hold that after viewing the evidence in the light most favorable to the prosecution, the evidence allowed the trier of fact to find beyond a reasonable doubt that Kordonowy committed each essential element of aggravated burglary and sexual intercourse without consent.

Section 45-6-204(2)(b), MCA, provides that "[a] person commits the offense of aggravated burglary if he knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein and: in effecting entry or in the course of committing the offense or in immediate flight thereafter, he purposely, knowingly, or negligently inflicts or attempts to inflict bodily injury upon anyone." Here, the evidence when viewed in the light most favorable to the prosecution allowed the jury to conclude beyond a reasonable doubt that Kordonowy knowingly entered K.B.'s home with the purpose of committing sexual intercourse without consent and in the process, inflicted bodily harm upon her.

Section 45-5-503(1), MCA (1989), provides in pertinent part that "[a] person who knowingly has sexual intercourse without consent with a person of the opposite sex commits the offense of sexual intercourse without consent." Here, the evidence viewed in the light most favorable to the prosecution allowed the jury to conclude beyond a reasonable doubt that Kordonowy engaged in sexual intercourse with K.B. without her consent.

In conclusion, we affirm Kordonowy's convictions of aggravated burglary and sexual intercourse without consent against K.B.

J. A. Turnage
Chief Justice

We concur:

John Conway Harrison

_(signature)_

William E. Hunt Sr.

_(signature)_

R.C. McDonough

_(signature)_
Justices