FILED

04/04/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0584

DA 15-0584

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 76

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

BRAD EDWARD DAFFIN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-14-28
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Colin M. Stephens, Nick K. Brooke, Smith & Stephens, P.C., Missoula, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, C. Mark Fowler, Assistant Attorney General, Helena, Montana

          William E. Fulbright, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs:  February 1, 2017

Decided:  April 4, 2017

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Brad Edward Daffin (Daffin) appeals the judgment entered by the Twenty-First Judicial District Court, Ravalli County, convicting him of eight counts of Sexual Intercourse Without Consent, three counts of felony Sexual Assault, three counts of Sexual Abuse of Children, and two counts of Criminal Distribution of Dangerous Drugs, and sentencing him to a cumulative total of five consecutive life sentences.[1]  We affirm and restate the issues as follows:

> *1. Did the District Court abuse its discretion by admitting evidence of prior acts under M. R. Evid. 404(b)?*
>
> *2.  Did the District Court err in applying § 45-5-511(2), MCA, Montana's Rape Shield Law?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     On January 9, 2014, R.S. disclosed to her school counselor that she had been sexually assaulted by Daffin, at the end of the previous summer, while she was 12-13 years old.  Later that day, at Emma's House, a Children's Advocacy Center in Hamilton, R.S. participated in a forensic interview with Valerie Widmer (Widmer), a licensed clinical social worker with specialized training in forensic interviews.  R.S. stated that she had met Daffin through her friend B.M., whose father worked for Daffin.  During the interview, R.S. revealed that Daffin had forced or coerced her to have sex multiple times, and induced her to send him a topless photo of herself.  R.S.'s allegations resulted in

---

[1] Daffin was sentenced to thirteen life sentences and three one-hundred-year sentences.  Some of these sentences run concurrently and some run consecutively.

Daffin being charged with two counts of Sexual Intercourse Without Consent, two counts of Sexual Assault, and one count of Sexual Abuse of Children.

¶3 Widmer conducted a forensic interview of B.M. the following day at Emma's House. B.M. reluctantly revealed that she also had been coerced to have sex and was sexually assaulted multiple times by Daffin during the previous summer, while she was 13 years old. B.M.'s allegations resulted in Daffin being charged with three counts of Sexual Intercourse Without Consent.

¶4 As the investigation continued, additional victims, former victims, and witnesses were identified. The victims and witnesses provided evidence covering a 20-year period of sexually predatory behavior by Daffin, as well as his use and distribution of dangerous drugs. The victims and witnesses provided details of how Daffin selected and groomed young female victims, eventually leading to him sexually assaulting them. From these reports Daffin was charged with additional counts of Sexual Intercourse Without Consent, Sexual Assault, and Sexual Abuse of Children, along with other crimes.

¶5 A.K. was one of the additional victims located during the investigation. A.K. was 18 years old at the time of her forensic interview. She revealed that, during the time she was 13-16 years old, she had been sexually assaulted by Daffin on multiple occasions; engaged in sex with Daffin in exchange for drugs; recruited other young girls to have sexual relations with Daffin; and helped to transport young girls and drugs, from Idaho to Montana, for Daffin. A.K.'s allegations resulted in Daffin being charged with two counts

of Sexual Intercourse Without Consent, one count of Criminal Distribution of Dangerous Drugs, and one count of Sexual Abuse of Children.

¶6 A.K.'s older sister, K.C., testified that she had known Daffin her entire life because he and her father were friends. K.C. testified to "partying" with her father and Daffin as a young child. When she was 12 years old, K.C.'s father was sent to prison and Daffin began to "flirt" with her. From the time she was 12 years old until she was approximately 18 years old, she was sexually assaulted by Daffin; had sex with Daffin in exchange for drugs and money; recruited other young girls to have sex with Daffin in exchange for drugs and money; and transported drugs and young girls for Daffin. K.C.'s allegations resulted in Daffin being charged with one count of Sexual Intercourse Without Consent, one count of Sexual Assault, one count of Criminal Distribution of Dangerous Drugs, and one count of Sexual Abuse of Children.

¶7 K.D., a former victim, also came forward. K.D. testified that Daffin sexually assaulted her when she was 15 years old, shortly after she had completed a youth drug treatment program. K.D.'s allegation resulted in Daffin being charged with one count of Sexual Intercourse Without Consent.

¶8 At trial, these five girls and women testified in detail concerning Daffin's process of selecting, grooming, sexually assaulting, and, finally, coercing them to secrecy. Additionally, the State called 29 other witnesses. These witnesses testified to aspects of the investigation and about their knowledge of Daffin's patterns of victim grooming and abuse.

4

¶9 After R.S. made her initial disclosure concerning Daffin, a third-party reported to the school counselor that R.S. had been sexually assaulted in a park by a group of teen boys. When the school counselor questioned R.S. about this, R.S. denied making any such allegation, and said "no one had done anything" to her. Later, R.S. wrote letters of apology to the boys who had been named in the incident. While not explicitly acknowledging she had made false sexual allegations, she offered that the matter was intended as a joke. Around the same time, R.S. recanted her allegations against Daffin. Based on this information, Daffin requested a hearing pursuant to *State ex rel. Mazurek v. Dist. Court of the Montana Fourth Judicial Dist.*, 277 Mont. 349, 922 P.2d 474 (1996), to present evidence of the false allegations made by R.S. and her recantation. After hearing the testimony, the District Court applied § 45-5-511(2), MCA, by ruling that evidence about the alleged sexual assault in the park by the boys was inadmissible, but that the evidence concerning R.S.'s recantation was admissible because it related directly to R.S.'s allegations against Daffin.

¶10 Daffin also moved in limine to exclude "other acts" evidence under M. R. Evid. 404(b). The District Court reserved ruling until trial, citing "the highly inflammatory nature of the evidence of sexual conduct." Later, it denied the motion in limine, reasoning:

> The State has adequately explained how it intends to use the evidence to show motive, intent and mental state, knowledge, and identity, which are all permissible purposes for admitting other acts evidence. Daffin's arguments that such evidence should be precluded because it is remote, is beyond the statute of limitations, and/or does not constitute a criminal

5

offense are without merit—none of these bear on relevance or justify precluding admissible other acts evidence.

¶11 Daffin was convicted of 16 of the 17 charges against him. He appeals, challenging the District Court's admission of "other acts" evidence and the court's application of § 45-5-511(2), MCA, Montana's Rape Shield Law.

## STANDARDS OF REVIEW

¶12 District courts have broad discretion to determine the admissibility of evidence. *State v. Madplume*, 2017 MT 40, ¶ 19, 386 Mont. 368, ___ P.3d ___ (citing *State v. Spottedbear*, 2016 MT 243, ¶ 9, 385 Mont. 68, 380 P.3d 810). We review evidentiary rulings for an abuse of discretion, which occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Madplume*, ¶ 19 (citing *Spottedbear*, ¶ 9). To the extent an evidentiary ruling is based on a district court's interpretation of the Montana Rules of Evidence, our review is *de novo*. *Madplume*, ¶ 19 (citing *Spottedbear*, ¶ 9).

¶13 We review a district court's application of a statute for correctness. *State v. Aguado*, 2017 MT 54, ¶ 9, 381 Mont. 1, ___ P.3d ___ (citing *State v. Colburn*, 2016 MT 41, ¶ 6, 382 Mont. 223, 366 P.3d 258).

## DISCUSSION

¶14 *1. Did the District Court abuse its discretion by admitting evidence of prior acts under M. R. Evid. 404(b)?*

¶15 M. R. Evid. 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

6

therewith." Rule 404(b) is designed to ensure that jurors "do not impermissibly infer that a defendant's prior bad acts make that person a bad person, and therefore, a guilty person." *Madplume*, ¶ 22, (citing *State v. Dist. Court of the Eighteenth Judicial Dist.*, 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415 (hereinafter "*Salvagni*")). However, evidence of prior bad acts, including uncharged crimes, is admissible for other purposes such "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M. R. Evid. 404(b). "The distinction between admissible and inadmissible Rule 404(b) evidence turns on the intended purpose of the evidence, not its substance." *Madplume*, ¶ 23 (citing *Salvagni*, ¶¶ 47, 62-63). "To prevent the permissible uses from swallowing the general rule barring propensity evidence, the trial court must ensure that the use of Rule 404(b) evidence is "'clearly justified and carefully limited.'" *Madplume*, ¶ 23 (quoting *State v. Aakre*, 2002 MT 101, ¶ 12, 309 Mont. 403, 46 P.3d 648). Rule 404(b) other acts evidence is admissible if the proponent can "clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." *State v. Clifford*, 2005 MT 219, ¶ 48, 328 Mont. 300, 121 P.3d 489 (quoting and citing *United States v. Himelwright*, 42 F.3d 777, 782 (3rd Cir. 1994)).

¶16 Daffin launches a broad-based attack on the State's overall case, arguing that the District Court abused its discretion by "allowing a mountain of prejudicial and confusing evidence regarding [his] alleged past conduct." Daffin urges us to turn a "jaundiced eye" toward the "mountain of irrelevant, prejudicial propensity evidence" used against him by

the State. Daffin's legal claims are that: (1) the State broadly failed to demonstrate a proper purpose for introducing evidence of Daffin's prior bad acts; (2) the sheer amount of evidence admitted was overwhelming and prejudiced the jury; and (3) the District Court failed to fulfill its gatekeeping function under M. R. Evid. 403. The State responds that evidence of Daffin's prior bad acts was admissible because it was "inextricably linked to and explanatory of" his conduct and was admitted to prove identity, motive, purpose and knowledge, and absence of mistake or accident. The State's "inextricably linked" argument is improperly drawn from the transaction rule, which the District Court did not address, and which is not at issue here. *See* § 26-1-103, MCA; *State v. Stout*, 2010 MT 137, ¶ 39, 356 Mont. 468, 237 P.3d 37 ("Application of the transaction rule should not be used to avoid Rule 404 . . . ."). Rather, we examine the purposes offered by the State under Rule 404(b), some of which overlap, for introduction of the challenged evidence. We then address the District Court's balancing of the factors in Rule 403.

**M. R. Evid. 404(b).**

*A.  Identity*

¶17  Evidence is admissible to demonstrate that a defendant employs a particular grooming pattern or uses "distinctive or idiosyncratic methods to lure victims into vulnerable positions that enable sexual assault." *Aakre*, ¶ 20 (citation omitted). "This identity exception is often used '[t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused.'" *Salvagni*, ¶ 60 (quoting *State v. Kordonowy*, 251 Mont. 44, 49, 823 P.2d 854, 857 (1991)).

8

"[S]imilarity between the prior crime and the alleged crime on trial is sufficient for admissibility, especially in the context of sex crimes." *Aakre*, ¶ 22 (citation omitted).

¶18　Here, the testimony of the former victims and other witnesses was used to establish Daffin's methods of victim selection and grooming. Some common elements of Daffin's "criminal signature" included: supplying his victims with alcohol and drugs; driving his victims around in his vehicle; "partying"[2] with his victims; taking them "mudding"[3]; and, eventually, assaulting them. Testimony about Daffin's pattern of sexual abuse detailed a process that started with "flirting"; escalated to sexual conversation and touching that bordered on sexual; proceeded to sexual contact; and concluded by telling the victims they were at fault or complicit in the abuse, and swearing them to silence.

### B. Motive

¶19　Evidence is admissible to show motive when separate acts can be explained by the same motive. *State v. Crider*, 2014 MT 139, ¶ 25, 375 Mont. 187, 328 P.3d 612 ("[A] prior bad act may evidence the existence of a motive without supplying the motive. In such cases, the motive is the cause and both the prior acts and the act at issue are effects."); *Salvagni*, ¶ 59 ("[T]he motive is cause, and the charged and uncharged acts are effects; that is, both acts are explainable as a result of the same motive. The prosecutor

---

[2] Some parties occurred in the mountains, at campgrounds or other recreational spots, and involved drinking alcohol and injecting, smoking, or snorting a variety of drugs, including methamphetamines, opiates, ketamine, and marijuana. Other such parties took place at Daffin's or one of his friend's houses.

[3] The victims and witnesses used a variety of terms to describe off-road mountain driving, such as fourbying, four-wheeling, mudding, and rock climbing.

uses the uncharged act to show the existence of the motive, and the motive in turn strengthens the inference of the defendant's identity as the perpetrator of the charged act.").

¶20 The testimony of former victims and witnesses demonstrated Daffin's longstanding sexual fixation with underage teen girls, particularly living in vulnerable family situations, and provided the motive for his crimes. The record reflected that Daffin pursued a sexual interest in underage females for approximately 20 years.

### C. Purpose and Mental State

¶21 In *State v. Stewart*, 2012 MT 317, ¶ 64, 367 Mont. 503, 291 P.3d 1187, we stated that a typical prosecution is reducible to three components: "(1) someone committed the *actus reus* (i.e., forbidden act) alleged in the indictment or information; (2) that person possessed the requisite *mens rea* (i.e., criminal intent or state of mind); and (3) that person was the defendant." (Citation omitted.) At trial, Daffin challenged the first and second components. He claimed that he did not abuse or sexually assault any of the victims of the charged crimes, and that any contact he had with them was appropriate.

¶22 The State's array of former victims and other witnesses demonstrated that Daffin's actions with the victims—including those actions, such as recreating in the mountains, that would be innocent and appropriate in circumstances of normative behavior—were perversely intended to abuse the victims, or set up that abuse. As we have previously stated, the use of other-acts evidence to prove either the *actus reus* or *mens rea* does not necessarily violate Rule 404(b). *Stewart*, ¶ 65. The testimony of Daffin's ex-wife,

10

long-time acquaintances, and former victims about Daffin's behaviors served to prove that he knowingly groomed and sexually assaulted the victims of the charged crimes.

¶23 While we could analyze the evidence under other factors listed in Rule 404(b), the above-referenced factors are sufficient to establish that the State's overall evidentiary case, as challenged here, was admitted for proper purposes. Further, given the large number of sexual charges the State had to prove, spanning many years, admission of the volume of sexual evidence was not an abuse of discretion, and the District Court properly fulfilled its gatekeeping function.

**M. R. Evid. 403.**

¶24 Daffin argues, "[a]ssuming *arguendo* some of the evidence was admissible for non-propensity reasons, the record reflects [that] the district court took no steps to balance the non-propensity value with [Daffin's] interest in a fair trial."

¶25 "All relevant evidence is admissible, except as otherwise provided by constitution, statute, these rules, or other rules applicable in the courts of this state." M. R. Evid. 402. Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "District courts have broad discretion to weigh the relative probative value of evidence against the risk of unfair prejudice." *Madplume*, ¶ 32 (citing *Stewart*, ¶ 68). While probative evidence is generally prejudicial to one side or the other, "[e]vidence rises to the level of being unfairly prejudicial only 'if it arouses the

11

jury's hostility or sympathy for one side without regard to its probative value, if it confuses or misleads the trier of fact, or if it unduly distracts from the main issues.'" *Madplume*, ¶ 33 (quoting and citing *State v. Hicks*, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149). "Even if evidence is potentially unfairly prejudicial, the Rule 403 balancing test favors admission—the risk of unfair prejudice must substantially outweigh the evidence's probative value." *Madplume*, ¶ 33.

¶26 The District Court denied Daffin's Rule 403 objection, reasoning:

> [T]he Court is not persuaded that the danger of unfair prejudice substantially outweighs the probative value of the evidence. Although the other acts evidence is prejudicial, it is also highly probative in view of Daffin's defense theory that the victims of the offenses of which he is charged are lying and conspired to make their accusations against him. The jury should be able to hear and weigh this other acts evidence.

¶27 Under the standards stated above, we conclude that the District Court did not abuse its discretion by admitting the other acts evidence after balancing its prejudicial effect against its probative value. The challenged evidence was particularly probative of the lengthy and detailed process used by Daffin to systematically, over many years, obtain control over certain kinds of potential victims, groom them for abuse, physically abuse them, and coerce their secrecy about the abuse.

¶28 *2. Did the District Court err in applying § 45-5-511(2), MCA, Montana's Rape Shield Law?*

¶29 Montana's Rape Shield Law is designed to prevent victims "from being exposed at trial to harassing or irrelevant questions concerning their past sexual behavior." *Colburn*, ¶ 22 (citation omitted). Section 45-5-511(2), MCA, reflects Montana's interest in

12

preventing the trial of the charge against the defendant "from becoming a trial of the victim's prior sexual conduct." *Colburn*, ¶ 22 (citing *State v. Higley*, 190 Mont. 412, 422, 621 P.2d 1043, 1050-51 (1980)). Section 45-5-511(2), MCA, states:

> Evidence concerning the *sexual* conduct of the victim is inadmissible in prosecutions . . . except evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution.

(Emphasis added.) The Rape Shield Law is balanced against the defendant's constitutional rights to confront his accusers and present evidence in his defense, because "[n]either the Rape Shield Law nor the defendant's right to confront and present evidence are absolute." *Colburn*, ¶ 25 (citation omitted). We have explained that:

> The Rape Shield Law therefore cannot be applied to exclude evidence arbitrarily or mechanistically and it is the trial court's responsibility to strike a balance in each case between the defendant's right to present a defense and a victim's rights under the statute. A court balancing the interest of the defendant with those protected by the Rape Shield Law should require that the proffered evidence is not merely speculative or unsupported.

*Colburn*, ¶ 25 (internal citations omitted). In cases involving an alleged prior false sexual accusation made by a victim, we have adopted a threshold inquiry to "establish both the fact of the accusations and the falsity thereof . . . before defense counsel launches into cross-examination." *State ex rel. Mazurek*, 277 Mont. at 358, 922 P.2d at 480 (internal quotation omitted). Under this inquiry:

> the defendant must establish, by a preponderance of the evidence, that (1) the accusation or accusations were in fact made; (2) that the accusation or accusations were in fact false; and (3) that the evidence is more probative than prejudicial. If the defendant satisfies these three conditions, the trial

13

court will authorize cross-examination of the complaining witness concerning the alleged false accusations. The defendant may thereafter present extrinsic evidence of the false accusations only if the complaining witness denies or fails to recall having made such accusations.

*State ex rel. Mazurek*, 277 Mont. at 358, 922 P.2d at 480 (internal punctuation and citation omitted).

¶30 Daffin requested a *Mazurek* hearing concerning evidence related to one of the victims, R.S. At the hearing, Shannon McMillan (McMillan), the mother of one of the boys who had been named in the story about R.S. being sexually assaulted in the park, testified that: (1) R.S. had sent texts to McMillan's son claiming that she loved him; (2) R.S. had "tried breaking up my son" from his girlfriend, who was R.S.'s friend; (3) R.S. "was really angry because [McMillan's son] still wouldn't date her, so she got several of her friends to threaten to beat him up for a couple weeks"; (4) R.S. "reported . . . to the school that a group of several boys had assaulted her sexually in a park after school"; (5) McMillan's son had received an apology note written by R.S.; and (6) as a result of the events concerning her son McMillan questioned R.S.'s veracity, concluding that "I believe that [R.S.] will lie to get herself not only out of trouble but to get attention, and I believe that she's - - she really needs a lot of mental help, because she's making accusation against lots of people and it's very damaging." Upon cross-examination, McMillan admitted that she did not know R.S. personally and that her testimony was largely based upon things her son and others had told her.

¶31 School Resource Officer Randy Eppinger (Eppinger) testified, stating that: (1) the initial allegation against McMillan's son was reported to the school counselor by a

student who had overheard two other students talking about it; (2) the school counselor had told him R.S. denied making the allegation; (3) he had spoken to R.S. and told her not to contact McMillan's son; and (4) McMillan's son told him R.S. had not contacted him after their conversation. Patricia Thomas (Thomas), one of Daffin's friends and the mother of one of R.S.'s friends, testified about R.S.'s recantation of her allegations against Daffin.

¶32 The District Court held that the threshold showing had been established for Thomas' testimony about R.S.'s recantation of her allegations against Daffin, and the evidence would be admitted. The District Court denied Daffin's request to introduce evidence about R.S.'s false allegation against the boys, reasoning that McMillan's testimony was based solely upon hearsay. The District Court stated, "[i]n the absence of any competent evidence to show that [R.S.] made a false allegation of sexual assault against . . . McMillan's son and other students, Daffin cannot establish even the first prong of the *Mazurek* test."

¶33 On appeal, Daffin urges that the failure to admit McMillian's testimony prohibited him from exploring and attacking R.S.'s credibility, and thus prejudiced his defense. He argues that R.S. suffers from mental illness, she made a false accusation to seek attention, and that McMillan's testimony would have both supported Thomas's testimony about R.S.'s recantation as well as called into question R.S.'s credibility. Further, Daffin asserts that most of the evidence presented at the *Mazurek* hearing did not relate to R.S.'s

sexual conduct, but instead to her mental health, which formed the basis of R.S.'s need to lie to seek attention.

¶34 To the extent the District Court applied § 45-5-511(2), MCA, to conduct other than R.S.'s *sexual* conduct, Daffin's argument is correct: the Rape Shield Law was inapplicable. Most of the evidence presented at the hearing did not relate to R.S.'s sexual conduct. However, that does not mean the evidence was admissible. McMillan's and Eppinger's testimony about R.S.'s alleged false accusation was based on hearsay and hearsay within hearsay, and much of McMillan's testimony was inadmissible at trial on that basis. Further, while Daffin now argues that he wanted to offer the theory that R.S.'s mental health problems led her to make the accusation against him, this theory is based on a brief observation made by Eppinger, at trial, that R.S. "just wanted her mother's attention," which is hardly a basis to frame such a defense. "We will affirm the district court when it reaches the right result, even if it reaches the right result for the wrong reason." *State v. Ellison*, 2012 MT 50, ¶ 8, 364 Mont. 276, 272 P.3d 646 (citing *City of Billings v. Staebler*, 2011 MT 254, ¶ 9, 362 Mont. 231, 262 P.3d 1101). For these reasons, to the extent the District Court erred in applying the Rape Shield Law, the error was harmless.

¶35 Affirmed.

/S/ JIM RICE

16

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER